**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
BIG STONE GAP DIVISION**

| | | |
|---|---|---|
| **SUSAN K. ELLIOTT,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:07cv00004 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | UNITED STATES MAGISTRATE JUDGE |

*I. Background and Standard of Review*

Plaintiff, Susan K. Elliott, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying plaintiff's claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and 1383(c)(3) (West 2003 & Supp. 2007). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning

-1-

mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Elliott protectively filed her applications for SSI and DIB on January 29, 2004, alleging disability as of January 3, 2003, due to depression, panic attacks from anxiety, pain from degenerative disc disease, gastroesophageal reflux and an undiagnosed skin disorder. (Record, ("R."), at 57-60, 71, 387-90, 110, 394.) The claims were denied initially and upon reconsideration. (R. at 39-41, 44, 45-47, 397-99.) She then requested a hearing before an administrative law judge, ("ALJ"), who held a hearing on August 2, 2005, at which Elliott was represented by counsel, but at which Elliott failed to appear. (R. at 48, 400-05.) A second hearing was held on November 11, 2005, at which Elliott appeared and was represented by counsel. (R. at 406-31.)

By decision dated December 13, 2005, the ALJ denied Elliott's claims. (R. at 17-25.) The ALJ found that Elliott met the disability insured status requirements of the Act for DIB purposes through the date of the decision. (R. at 24.) The ALJ found that Elliott had not engaged in substantial gainful activity since January 3, 2003. (R. at 24.) The ALJ found that the medical evidence established that Elliott's degenerative disc disease, spondylosis, chronic obstructive pulmonary disease, ("COPD"), and panic disorder were severe. (R. at 24.) Although the ALJ found that Elliott suffered from severe impairments, he found that these impairments did not meet or medically

equal one of the listed impairments found at 20 C.F.R. Part 404, Subpart , Appendix 1. (R. at 24.) The ALJ found that Elliott's allegations regarding her pain and symptoms were not totally credible. (R. at 24.) The ALJ found that Elliott had the residual functional capacity for simple, low-stress light work[1] that did not require work around dust, fumes and other respiratory irritants. (R. at 24.) Thus, he found that Elliott was unable to perform any of her past relevant work. (R. at 24.) Based on Elliott's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Elliott could perform, including those of a file clerk, a host/greeter, a food preparer, a bus person/dishwasher, an office clerk, an information clerk and a hand packer. (R. at 25.) Thus, the ALJ concluded that Elliott was not under a disability under the Act and was not eligible for DIB or SSI benefits. (R. at 25.) *See* 20 C.F.R. §§ 404.1520(g), 416.920 (g) (2007).

After the ALJ issued his decision, Elliott pursued her administrative appeals, (R. at 12-13), but the Appeals Council denied her request for review. (R. at 7-9.) Elliott then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). The case is before this court on Elliott's Motion For Summary Judgment filed June 19, 2007, and the Commissioner's Motion For Summary Judgment filed July 16, 2007.

---

[1]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

Case 2:07-cv-00004-JPJ-PMS   Document 15   Filed 02/08/08   Page 3 of 17   Pageid#: 64

## II. Facts

Elliott was born in 1962, which classified her as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2007). (R. at 57, 387.) Elliott has a high school education. (R. at 77.) She has past work experience as a customer service representative, a labor foreman and a deli worker. (R. at 91, 412-13.) Elliott testified at her hearing that she quit working because she had " a lot of heath problems." (R. at 415.) She also testified that she had daily, severe lower back pain, anxiety and pain in her right wrist due to carpal tunnel syndrome. (R. at 415-24.) She stated that she could sit for up to 30 minutes and stand for up to 15 minutes without interruption. (R. at 417.)

Cathy Sanders, a vocational expert, also was present and testified at Elliott's hearing. (R. at 429-30.) Sanders testified that Elliott's work as a customer service representative was light and semiskilled, her work as a deli worker was light and unskilled, and her work as a labor foreman was medium[2] and skilled. (R. at 429.) Sanders was asked to consider a hypothetical individual of Elliott's age, education and work history, who was restricted to simple, low-stress, light work and who could not have excessive exposure to dust, fumes, chemicals and temperature extremes. (R. at 429.) Sanders testified that such an individual could perform work as a stapler, an assembler, miscellaneous food preparation jobs such as bus persons and dishwashers, a general office clerk, an information clerk, a host/greeter, a hand packer and a filing clerk. (R. at 430.) The ALJ additionally asked Sanders if the individual could work

---

[2]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can do medium work, she also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2007).

-4-

if she also had the restrictions as set forth by Dr. Todd Cassel on November 21, 2005.[3] (R. at 385-86, 430.) Sanders testified that an individual with the limitations set forth by Dr. Cassel would not be able to perform any jobs. (R. at 430.)

In rendering his decision, the ALJ reviewed records from Holston Medical Group; Dr. Nancy Lanthorn, Ph.D., a licensed clinical psychologist; Dr. Todd A. Cassel, M.D.; Dr. John D. Fenley, M.D.; Dr. Joel D. Gonce, M.D.; Gretchen Wright, L.C.S.W; Dr. Galen Smith, M.D.; Tri-Care/Stress-Care Behavioral Health Centers, L.L.C.; Clinch River Health; B. Wayne Lanthorn, Ph.D., a licensed clinical psychologist; Indian Path Medical Center; Centers for Integrative Medicine; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Robert O. McGuffin, M.D., a state agency physician; Joseph Leizer, Ph.D., a state agency psychologist; and Julie Jennings, Ph.D., a state agency psychologist.

On February 12, 2002, Elliott reported to Dr. Joel D. Gonce, M.D., for cough and cold with congestion. (R. at 129-30.) An x-ray of the chest taken on February 14, 2002, revealed a normal heart and pulmonary vascularity, as well as thickened interstitial markings and scattered calcifications suggestive of old granulomatous disease. (R. at 131.) On February 15, 2002, Elliott saw Dr. Gonce, for head pressure. (R. at 127-28.) Dr. Gonce diagnosed sinusitis. (R. at 128.) Elliott was told to return

---

[3]Dr. Cassel found that Elliott could lift and/or carry items weighing up to 15 pounds occasionally and could lift and/or carry items weighing up to 5 pounds frequently. (R. at 385.) He also found that she could stand/walk for up to 15 minutes and could sit for up to 30 minutes without interruption. (R. at 385.) Dr. Cassel found that Elliott could never climb, crouch, or crawl and could occasionally to never stoop and kneel, but could occasionally balance. (R. at 386.) He opined that Elliott should avoid heights, moving machinery, temperature extremes, chemicals, dust, fumes and vibration. (R. at 386.)

to work on February 19, 2002. (R. at 128.) She returned for a follow-up exam on February 19, 2002, with complaints of being "tired all the time." (R. at 125-26.) Dr. Gonce assessed Elliott with infectious mononucleosis. (R. at 126.) A report was sent to Scott County Telephone on February 28, 2002, from Holston Medical Group stating that Elliott could return to work on March 6, 2002. (R. at 124.) She returned to Dr. Gonce on March 6, 2002, complaining of lack of energy. (R. at 122.) On March 12, 2002, she was told that she could return to work on March 14, 2002. (R. at 120.)

Nancy Lanthorn, Ph.D., saw Elliott from August 14, 2002, to March 24, 2003.[4] (R. at 138-54.) An intake form dated August 14, 2002, stated that Elliott was being harassed at work due to illnesses. (R. at 153.) It also stated that Elliott was getting a divorce, was experiencing depression and panic attacks and was having "a lot of muscle aches and pain[s]." (R. at 153.) On August 19, 2002, Lanthorn noted that Elliott was extremely upset. (R. at 151.) On August 26, 2002, Lanthorn noted that Elliott continued to have crying spells. (R. at 151.) A Millon Clinical Multiaxial Inventory-III, ("MCMI-III"), was performed on August 19, 2002. (R. at 148-50.) Elliott was diagnosed with double depression and generalized anxiety. (R. at 150.) Elliott reported to Lanthorn with severe stress on September 6, 2002. (R. at 147.) Elliott reported being harassed and alienated by her employer. (R. at 142-45, 147.) Elliott reported being asked to resign because she failed a drug test, and she reported that she felt very depressed on January 7, 2003. (R. at 141.) Elliott continued to report stress as a result of losing her job and health insurance on January 21 and 28, 2003. (R. at 138.) Elliott reported having panic attacks on March 24, 2003, and that her

---

[4]A note dated March 12, 2002, appears to be mistakenly dated. It appears that due to the intake being dated August 14, 2002, that the above-listed date should be March 12, 2003. (R. at 154.)

generic medications were not working as well. (R. at 154.)

Elliott saw Dr. Todd A. Cassel, M.D., on January 27, 2004, complaining of leg pain and requesting pain and nerve medication prescriptions. (R. at 167.) She returned to Dr. Cassel on April 15, 2004, complaining of back pain radiating into her left leg. (R. at 164.) On April 22, 2004, she complained of increased wheezing and received a breathing treatment, which gave her relief. (R. at 163.) On June 14, 2004, Elliott complained of nervousness, and she stated that she used more pain pills during her period, resulting in her running out of medication. (R. at 161.) She stated on August 13, 2004, that her pain problems were about the same, maybe a little better with exacerbations at times. (R. at 158.) On August 16, 2004, she reported "coughing a lot" and being sore all over. (R. at 156.) Dr. Cassel continued to counsel her about tobacco and its effects. (R. at 156.)

A Magnetic Resonance Image, ("MRI"), of the lumbar spine taken January 16, 2004, revealed a small left lateral disc protrusion at the L2-3 level of the spine, a broad-based disc protrusion asymmetric to the left and a mild left L4 nerve root compression at the L3-4 level of the spine, a broad-based central disc protrusion at the L4-5 level of the spine and a bilateral pars interarticularis defect with a grade I anterolisthesis at the L5-S1 level of the spine. (R. at 176-77.)

Elliott denied ever using cocaine to Dr. John D. Fenley, M.D., on March 17, 2003, despite a positive urine drug screen on December 19, 2002. (R. at 185.) Elliott saw Gretchen Wright, L.C.S.W., on September 11, 2003, for a psychiatric diagnostic intake. (R. at 194-97.) Elliott complained of panic attacks. (R. at 194.) Wright

diagnosed panic disorder without agoraphobia and major depression, and ruled out dependent, borderline personality disorder. (R. at 197.) Wright assessed Elliott's then-current Global Assessment of Functioning, ("GAF"), score at 55.[5] (R. at 197.)

Elliott reported to Wright on October 22, 2003, that she was having bad panic attacks and wanted Wright to talk with Dr. Cassel about changing her back to Valium or increasing her Xanax dosage. (R. at 193.) Elliott cancelled two appointments. (R. at 191-92.) Elliott reported to Wright on February 11, 2004, that she continued to have pain. (R. at 190.) Elliott reported having back pain to some degree on April 8, 2004. (R. at 188.) On May 13, 2004, Wright reported that Elliott's Valium dosage was increased, which helped her pain. (R. at 186.)

Elliott saw Dr. Cassel from October 27, 2004, to June 1, 2005. (R. at 306-17.) On November 29, 2004, Elliott presented with lower back pain and stated she was out of Percocet and that Lortab was not helping. (R. at 313.) Dr. Cassel gave her prescriptions for Lortab, Percocet and Flexeril. (R. at 313.) On January 21, 2005, Elliott presented to Dr. Cassel with complaints of anxiety and pain at bedtime. (R. at 310.) On March 29, 2005, Elliott presented with exacerbation of COPD. (R. at 307.)

Dr. Galen Smith, M.D., saw Elliott on March 22, 2004, for lower back pain. (R. at 198-200.) Dr. Smith found that Elliott exhibited good motor function in her

---

[5]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate difficulty in social, occupational, or school functioning ...." DSM-IV at 32.

-8-

lower extremities and that she could walk normally. (R. at 199.) Straight leg raise testing was negative to 90 degrees bilaterally. (R. at 199.) Dr. Smith diagnosed a Grade I spondylolisthesis at the L5-S1 level of the spine and diffuse degenerative disc disease, which was worst at the L5-S1, L4-5 and L3-4 levels of the spine. (R. at 199.) He recommended nonoperative treatment. (R. at 199.) He also recommended that she be referred for physical therapy, fitted with a lumbar sacral corset and given a referral to a pain clinic. (R. at 199.)

A Physical Residual Functional Capacity Assessment, ("PRFC"), was completed on July 2, 2004, by Dr. Robert O. McGuffin, M.D., a state agency physician, and affirmed by Dr. Frank M. Johnson, M.D., another state agency physician, on October 14, 2004. (R. at 201-08.) They found that Elliott could perform light work. (R. at 202.) They further found that she could frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds. (R. at 204.) Drs. McGuffin and Johnson also found that Elliott could occasionally balance, stoop, kneel, crouch and crawl. (R. at 204.) They imposed no manipulative, visual or communicative limitations. (R. at 204-05.) However, Drs. McGuffin and Johnson opined that Elliott should avoid all exposure to hazards, such as machinery and heights. (R. at 206.)

A Psychiatric Review Technique form, ("PRTF"), was completed on July 6, 2004, by Joseph Leizer, Ph.D., a state agency psychologist, and affirmed by Julie Jennings, Ph.D., another state agency psychologist, on October 14, 2004, indicating that Elliott suffered from an affective disorder and anxiety-related disorder. (R. at 209-22.) They opined that Elliott experienced moderate difficulties in maintaining

concentration, persistence, or pace, that she experienced mild difficulties in maintaining social functioning and that she experienced no restrictions in her activities of daily living. (R. at 219.) Leizer and Jennings also found that Elliott had experienced no episodes of decompensation. (R. at 219.)

On July 6, 2004, Leizer also completed a mental assessment, which also was affirmed by Jennings on October 14, 2004. (R. at 223-26.) They found that Elliott was moderately limited in her abilities to understand, remember and carry out detailed instructions, to maintain attention and concentration for extended periods and to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 223-24.) They found that Elliott was not significantly limited in all other areas. (R. at 223-24.)

Elliott saw Wright from March 3, 2004, to October 6, 2004. (R. at 227-37.) Wright found Elliott to have mild to moderate depression and moderate anxiety on September 22, 2004, and May 27, 2004, (R. at 228,234.), and moderate depression and anxiety on several dates that are illegible. (R. at 229-30, 232-33, 237.) Elliott was found by Wright to have moderate depression and moderate to severe anxiety on March 25, 2004, and April 24, 2004. (R. at 234-35.)

B. Wayne Lanthorn, Ph.D., a clinical psychologist, on February 9, 2005, evaluated Elliott at the request of the Virginia Department of Rehabilitative Services. (R. at 238-45.) Lanthorn found no observable tremors or psychomotor retardation, hallucinations were denied, he found no overt signs of disordered thought processes

-10-

or delusional thinking, and he found Elliott to be rational and alert. (R. at 241.) Elliott reported that she had panic attacks that would leave her weak for 24 hours. (R. at 241.) Lanthorn found that Elliott could relate appropriately to the examiner and that she should be able to relate adequately to others. (R. at 242.) Elliott completed a Personality Assessment Inventory, ("PAI"), which showed significant elevations in the areas of conversion, somatization, health concerns, physiological anxiety, resentment, phobias and negative relations, with her most significant elevation in the area of somatization. (R. at 242.) Lanthorn diagnosed panic disorder without agoraphobia, (somewhat stabilized with the use of medication), nicotine dependence and alcohol abuse, early full remission by her report. (R. at 243.) Elliott reported relatively mild or transient depressive symptomatology. (R. at 243.) Lanthorn assessed her then-current GAF score at 60. (R. at 244.)

Elliott was hospitalized at Indian Path Medical Center from March 1- 3, 2005, with possible pneumonia. (R. at 249.) A MRI of the spine on March 2, 2005, found a Grade I anterolisthesis of the L5-S1 level of the spine with associated mild disc bulging and spondylosis. (R. at 291.) She was discharged with a diagnosis of COPD exacerbation due to tobacco abuse. (R. at 290.) She was strongly advised not to smoke. (R. at 290.)

On May 25, 2005, Elliott presented to Indian Path Medical Center after falling and twisting her right ankle and left wrist. (R. at 369-70.) An x-ray of the ankle revealed no acute bony or joint space abnormalities. (R. at 369.) Likewise, an x-ray of the left wrist revealed no acute bony or joint space abnormalities. (R. at 370.)

A physical assessment was completed by Dr. Cassel on November 21, 2005. (R. at 385-86.) He found that Elliott was able to lift items weighing up to 15 pounds occasionally, and items weighing up to 5 pounds frequently, that she could stand and/or walk for a total of 15 minutes without interruption in an eight-hour workday and could sit for a total of 30 minutes without interruption in an eight-hour workday. (R. at 385.) He also found that she could never climb, crouch or crawl, could occasionally to never kneel and stoop and could only occasionally balance. (R. at 386.) Dr. Cassel also found that Elliott should avoid being around heights, moving machinery, temperature extremes, chemicals, dust, fumes and vibration. (R. at 386.)

### *III. Analysis*

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether the claimant: 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairment. Once the

-12-

claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano,* 617 F.2d 1050, 1053( 4th Cir. 1980).

By decision dated December 13, 2005, the ALJ denied Elliott's claims. (R. at 17-25.) The ALJ found that the medical evidence established that Elliott's degenerative disc disease, spondylosis, COPD and panic disorder, were considered severe. (R. at 24.) Although the ALJ found that Elliott suffered from severe impairments, he found that these impairments did not meet or medically equal one of the listed impairments found at 20 C.F.R Part 404, Subpart P, Appendix 1. (R. at 24.) The ALJ found that Elliott's allegations regarding her pain and symptoms were not totally credible. (R. at 24.) The ALJ found that Elliott had the residual functional capacity for simple, low-stress light work that did not require work around dust, fumes and other respiratory irritants. (R. at 24.) Thus, he found that Elliott was unable to perform any of her past relevant work. (R. at 24.) Based on Elliott's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that jobs existed in significant numbers in the national economy that Elliott could perform, including those of a file clerk, a host/greeter, a food preparer, a bus person/dishwasher, an office clerk, an information clerk, and a hand packer. (R. at 25.) Thus, the ALJ concluded that Elliott

-13-

was not under a disability under the Act and was not eligible for DIB or SSI benefits. (R. at 25.) *See* 20 C.F.R. §§ 404.1520(g), 416.920 (g) (2007).

In her brief, Elliott argues that the ALJ erred in failing to accord proper weight to the opinion of Elliott's treating physician, Dr. Cassel. (Plaintiff's Brief In Support Of Motion for Summary Judgment, ("Plaintiff's Brief"), at 8-10.) Elliott also argues that the ALJ's residual functional capacity determination is not supported by substantial evidence. (Plaintiff's Brief at 10-13.) She finally argues that the Commissioner has failed to sustain his burden of establishing that there is work in the national economy that Elliott can perform. (Plaintiff's Brief at 13-15.)

Based on my review of the evidence, I find that substantial evidence does not support the ALJ's finding that Elliott was not disabled. In particular, the ALJ specifically found that, in addition to a need to perform simple low-stress jobs, Elliott experienced moderate difficulties in maintaining attention and concentration. (R. at 22.) This finding is supported by the findings of the state agency psychologists. (R. at 223-24.) The ALJ based his finding that Elliott was not disabled on the testimony of the vocational expert that other jobs existed that Elliott could perform. (R. at 23, 25.) To constitute substantial evidence to support this finding, however, the testimony of the vocational expert must have been based on a proper hypothetical. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989). In this case, the hypothetical presented to the vocational expert did not include the ALJ's finding that Elliott had moderate difficulties in maintaining attention and concentration. (R. at 429-30.) That being the case, the vocational expert's opinion does not constitute substantial evidence for the ALJ's finding that Elliott was not

-14-

disabled.

I do find that substantial evidence exists in the record to support the ALJ's weighing of the medical evidence and his findings as to Elliott's residual physical and mental functional capacity.

Based on the above, I find that substantial evidence does not exist in this record to support the ALJ's finding that Elliott was not disabled, and I recommend that the court deny the Commissioner's motion for summary judgment, deny Elliott's motion for summary judgment, vacate the Commissioner's decision denying an award of DIB and SSI benefits and remand Elliott's claims to the Commissioner for further consideration.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the Commissioner's finding as to Elliott's residual functional capacity;

2. Substantial evidence does not exist in the record to support the Commissioner's finding that other jobs existed that Elliott could perform; and

3. Substantial evidence does not exist in the record to support

-15-

the Commissioner's finding that Elliott was not disabled.

## RECOMMENDED DISPOSITION

The undersigned recommends that this court deny the Commissioner's motion for summary judgment, deny Elliott's motion for summary judgment, vacate the Commissioner's decision denying an award of DIB and SSI benefits and remand Elliott's claims to the Commissioner for further consideration.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C):

> Within ten days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 10 days could waive appellate review. At the conclusion of the 10-day period, the Clerk is directed to transmit the record in this matter to the

Honorable James P. Jones, Chief United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED: This 8th day of February 2008.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE